IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Criminal Action No. |
| | ) | 06-00132-01-CR-W-ODS |
| OSCAR SILVA-YANEZ, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Before the court is defendant's motion to suppress evidence on the ground that defendant's residence was searched without his consent and without a warrant. I find that defendant voluntarily consented to the search of his residence. Therefore, defendant's motions to suppress should be denied.

*I.  BACKGROUND*

On March 13, 2006, police went to defendant's residence and asked if they could come inside to talk to him. He agreed. Defendant had told them he was home alone, but police observed a man in the kitchen with a power drill. When police asked if they could look through the house to see if anyone else was there, or if there was anything there that could harm them, defendant said it was OK to look, and that the only things he had in the residence were a gun

under his pillow and marijuana that had been seen on the kitchen table. Defendant signed a consent to search form, and police recovered a bag of money in his bedroom and the gun under his pillow.

On March 22, 2006, a criminal complaint was filed charging defendant with one count of possessing a firearm while in the United States illegally, in violation of 18 U.S.C. §§ 922(g)(5) and 924(a)(2). On April 5, 2006, an indictment was returned charging the same offense. Defendant filed the instant motion to suppress on May 16, 2006. On May 23, 2006, the government filed a response, arguing that defendant voluntarily consented to the search of his residence.

On June 13, 2006, I held an evidentiary hearing on defendant's motion to suppress. The government appeared by Assistant United States Attorney Stefan Hughes. The defendant was present, represented by Assistant Federal Public Defender Laine Cardarella. Senior Special Agent Tim Deiter with the Bureau of Immigration and Customs Enforcement testified. In addition, the following exhibits were admitted:

    P. Ex. 1  Consent-to-search form written in both Spanish and English and signed by defendant

2

    P. Ex. 2   <u>Miranda</u> waiver form printed in Spanish and signed by defendant

    P. Ex. 3   Disclaimer form, written in Spanish, disclaiming any interest in money that was found at defendant's residence, signed by defendant

    P. Ex. 4   Photograph of kitchen table

    P. Ex. 5   Photograph of kitchen table with Ziploc bag

    P. Ex. 6   Photograph of cash

    P. Ex. 7   Photograph of cash

    P. Ex. 8   Photograph of television in defendant's bedroom

    P. Ex. 9   Photograph of brown bag found behind television with cash inside

    P. Ex. 10  Photograph of gun and two magazines

    P. Ex. 11  Photograph of gun and two magazines

## II. EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1. On March 13, 2006, Special Agent Tim Deiter was contacted by Task Force officer Winson (Tr. at 4-5). TFO Winson stated that a car had been spotted at a Best Western hotel in Independence, Missouri, with Mexico license plates (Tr. at 5, 31). TFO Winson asked Special Agent Deiter to check the license plate to see if there was a record of the

vehicle having crossed into the United States (Tr. at 5). He also asked Special Agent Deiter to check on the entry of an individual he believed to be the occupant of the car (Tr. at 5).

    2.    Special Agent Deiter learned that the vehicle and one of the subjects had crossed into the United States on March 9, 2006, at the same port of entry with the same inspector within one minute of each other, one at 9:49 p.m. and one at 9:50 p.m. (Tr. at 5-6).

    3.    Task Force Officers then learned that the individuals had come to the hotel without reservations, had paid for the first night with cash, and then had stayed a second night, also paying with cash (Tr. at 6). Officers observed the vehicle traveling to 1304 Cleveland (Tr. at 6, 31). One of the individuals left 1304 Cleveland at 2:22 p.m. on March 13 (Tr. at 6, 31). That person was stopped on the highway (Tr. at 6, 31). Approximately $6,000 in cash was found in the trunk, and a narcotics-trained dog alerted positively to the cash, which was seized (Tr. at 7, 46). The individual stopped did not provide any information about any activity at 1304 Cleveland (Tr. at 32).

    4.    The officers then went to 1304 Cleveland along with Special Agent Deiter (Tr. at 7). Special Agent Deiter

4

knocked on the door at approximately 4:10 p.m., and defendant answered (Tr. at 7). Special Agent Deiter presented his badge and credentials, and explained to defendant that he worked with Immigration and Customs Enforcement, but also worked with the DEA Task Force (Tr. at 8). Special Agent Deiter said this in English, then asked defendant if he understood English (Tr. at 8). Defendant said he did not, so Special Agent Deiter repeated it all in Spanish (Tr. at 8, 10). Special Agent Deiter asked defendant if he understood, and he said he did (Tr. at 10). Defendant identified himself as Marco Perez-Ruiz (Tr. at 9).

    5.   Special Agent Deiter said he was conducting a narcotics investigation and would like to ask defendant some questions (Tr. at 10). Defendant said OK (Tr. at 11). Neighbors began coming out to the porch and watching what was going on (Tr. at 11). Special Agent Deiter asked if they could step inside since all the neighbors were coming out, he said he did not want to embarrass defendant or cause him any problems with his neighbors (Tr. at 11, 34). Defendant said, "Yeah, come on in" (Tr. at 12). Defendant never said or indicated that he did not want the officers to come inside (Tr. at 30).

5

6.  No one threatened defendant or produced any weapons or any other means of coercion to get defendant to let them inside (Tr. at 13).

7.  They went inside the house and sat down in the family room (Tr. at 14). For everyone's safety, Special Agent Deiter asked if there was anyone else in the residence (Tr. at 14). Defendant said there was no one else there (Tr. at 14). Special Agent Deiter asked defendant if he could do a cursory search just for other people to make sure no one else was there (Tr. at 14, 36). Defendant said, "No, there's no one else here. Go ahead." (Tr. at 14). Special Agent Deiter and another officer stayed with defendant while other officers walked through the house (Tr. at 14).

8.  The officers walked from the family room to the dining room, and as they got to the wall between the dining room and kitchen, they observed a man in the kitchen area (Tr. at 14, 36, 47). This was defendant's landlord, and he had a cordless power drill in his hand[1] (Tr. at 14-15, 36,

---

[1]The man was asked to put the drill down, and he was asked biographical information (Tr. at 48). The man spoke English and stated that defendant rented the place (Tr. at 48). The landlord was then released (Tr. at 48).

6

48). At first the officers thought the power drill was a firearm; and because defendant had said there was no one else in the house, they were very surprised (Tr. at 15, 36).

    9. Special Agent Deiter said to defendant, "You said there was no one in the house. Now we got this guy coming out from behind the wall. Is there anyone or anything else in this house that could hurt us?" (Tr. at 15, 37). Defendant said he forgot about the landlord (Tr. at 16, 37). He said, "The only thing else in this house, I've got that marijuana on the kitchen table, and I've got a gun under my pillow in the bedroom." (Tr. at 16, 37). No one had said anything about the marijuana in the kitchen, but when the officers saw the landlord, they saw the marijuana on the kitchen table (Tr. at 37).

    10. Special Agent Deiter said he would like to get the gun and secure it, and he asked defendant to tell him where the gun was located (Tr. at 16). Defendant said, "It's not a problem, it's in my bedroom underneath the pillow." (Tr. at 16). One of the officers went to the bedroom and located the gun under the pillow (Tr. at 16, 37-38).

    11. Special Agent Deiter again told defendant the officers were conducting a narcotics investigation (Tr. at 16). He asked defendant for consent to search the residence

7

for narcotics or large amounts of money (Tr. at 17, 39). Defendant verbally consented (Tr. at 17). Special Agent Deiter filled out a consent-to-search form[2], read it to defendant, explained it to him, and then defendant signed it (Tr. at 17, 19). The form is printed in both English and Spanish (Tr. at 17; P. Ex. 1). No one forced, threatened, or coerced defendant into signing the form (Tr. at 18). Defendant never indicated that he did not understand anything in the form (Tr. at 20). Defendant signed the form using the name Marco Perez (Tr. at 18, 20; P. Ex. 1).

12. During the subsequent search, police recovered notes indicative of narcotics trafficking and a brown paper bag behind a television set in defendant's bedroom that contained $6,600 cash (Tr. at 20).

---

[2]The form reads as follows: "I have been informed of my constitutional right to not have a search made of the premises hereinafter specified without a search warrant. I have been warned that anything discovered during such a search may be used against me or in any court or in immigration or administrative proceeding. I hereby authorize immigration officers and officers from KCITF and DEA to conduct a complete search of my premises located at [the address was left blank] and to take therein any papers, letters, papers, materials, illegal narcotics, guns, U.S. currency or other property which they may desire. I have given this authorization to the above-named officer or offices voluntarily and without threats, promises, pressure or coercion of any kind." (Tr. at 19; P. Ex. 1).

8

13. Special Agent Deiter asked defendant what country he was from and his status in the United States (Tr. at 21, 40). Defendant again identified himself as Marco Perez-Ruiz, said he was a citizen of Mexico, and said he was illegally in the United States (Tr. at 21). Special Agent Deiter advised defendant of his <u>Miranda</u> rights and said he wanted to ask defendant some questions about the gun (Tr. at 21). Special Agent Deiter presented a <u>Miranda</u> waiver form[3], printed in Spanish, and read it to defendant (Tr. at 21-22). Underneath the part of the form which states, "I have read or have read to me this declaration about my rights and I understand what my rights are", defendant signed his name Marco Perez (Tr. at 22; P. Ex. 2). The next line under that reads, "I am willing to give declarations and ask questions

---

[3]The form reads as follows: "Before we ask you any questions, you should understand your rights. You have the right to remain silent. Anything you say can be used against you in a court of law or at any proceeding, administrative or immigration. You have the right to speak with an attorney, for him to be able to counsel you before we ask any questions and to have him present with you during the questioning. If you do not have the money to employ an attorney, an attorney can be assigned to or portioned to you before we ask you any questions, if you desire. If you decide to answer questions, our questions now without an attorney present, you will always have the right to stop answering questions when you like. You'll also have the right to stop answering questions when you like until you can speak with an attorney." (Tr. at 23-24).

9

or answer questions. For the moment, I do not desire to have an attorney. I understand and am conscious of what I am doing. I have not been subjected to promises, threats, pressure, or coercion of any kind." (Tr. at 22). Defendant then invoked his right to remain silent (Tr. at 22, 48). No further questions were asked (Tr. at 22).

    14. One of the officers then came out of the bedroom and, in English, stated to a Senior DEA agent that he had found a bag of money (Tr. at 24-25, 43, 49). Defendant, in English, said that the gun and the marijuana were his, but he did not know anything about the money (Tr. at 24, 25, 43, 49). A DEA Agent obtained a disclaimer form and gave it to Special Agent Deiter (Tr. at 25). Because the money was going to be seized, Special Agent Deiter asked defendant if he would sign a disclaimer form if the money was not his (Tr. at 25, 49). The form is printed in Spanish and reads as follows:

> Disclaimer of Possession of Money
>
> I recognize that on the day 3/13/06 that a quantity of cash, one bundle of cash, was recovered by the agents from the Department of Drugs and Narcotics of the United States of America. Therefore, for this I declare that I am not the owner of this money, and I do not have the right to have them return it to me. The

10

owner of this money is [space for name and address,
which were left blank].  This money was found under the
following circumstances.  A consensual search of 1304
Cleveland Avenue, Kansas City, Missouri.

(Tr. at 26; P. Ex. 3).

15.  Defendant signed the form with the name Marco Perez (Tr. at 26; P. Ex. 3).

16.  Defendant's fingerprints were taken and submitted to the FBI fingerprint database (Tr. at 45).  Defendant's fingerprints came back as Oscar Silva-Yanez (Tr. at 45).

### *III. CONSENT TO SEARCH*

Even when police officers have neither probable cause nor a warrant, they may search an area if they obtain a voluntary consent from someone possessing adequate authority over the area.  <u>United States v. Matlock</u>, 415 U.S. 164, 171 & n. 7 (1974); <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 222 (1973).  Voluntary consent need not amount to a waiver. <u>United States v. Chaidez</u>, 906 F.2d 377, 380 (8th Cir. 1990). Consent can be voluntary without being an "intentional relinquishment or abandonment of a known right or privilege."  <u>Bustamonte</u>, 412 U.S. at 235.  The proper test is whether the totality of the circumstances demonstrates that the consent was voluntary.  <u>Id</u>. at 226.

11

The government bears the burden of proving a voluntary consent to search by a preponderance of the evidence. Bumper v. North Carolina, 391 U.S. 543, 548 (1968); United States v. Ramey, 711 F.2d 104, 107 (8th Cir. 1983). The question of whether the consent was voluntarily given is a question of fact for the trial court. United States v. Cortez, 935 F.2d 135, 142 (8th Cir. 1991); United States v. Alberts, 721 F.2d 636 (8th Cir. 1983). Consent is voluntary if it was "the product of an essentially free and unconstrained choice by its maker" rather than the product of duress or coercion, express or implied. Bustamonte, 412 U.S. at 225, 227. This determination depends upon the totality of the circumstances in a particular case. Id. at 226.

Here, defendant agreed to let the officers inside his house to talk when his neighbors began coming out to see what was going on. When Special Agent Deiter asked defendant if they could look through the house just to see if anyone else was present, defendant said, "There's no one else here. Go ahead." Police then encountered a man in the kitchen holding what at first appeared to be a weapon. Special Agent Deiter asked defendant if there was anyone or anything in the residence that could harm them. Defendant

12

said he forgot about the landlord being there, and then said, "The only thing else in this house, I've got that marijuana on the kitchen table, and I've got a gun under my pillow in the bedroom." Special Agent Deiter said he would like to get the gun secured, and defendant said, "It's not a problem, it's in my bedroom underneath the pillow." Defendant was again informed of the narcotics investigation, and he verbally consented to a search of the residence, then he signed a consent-to-search form printed in Spanish.

There is no evidence of duress or coercion, express or implied. The Eighth Circuit has upheld the finding of a voluntary consent to search under circumstances very similar to these.

> We examine the totality of the circumstances in determining whether consent was given voluntarily, including the nature of the encounter and the characteristics of the consenting party. Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973); United States v. Chaidez, 906 F.2d 377, 380-81 (8th Cir. 1990). After Castilleja explained that cooperation was voluntary, Evencio and Steven agreed to a search of the apartment. They were not under arrest, Castilleja read through a Spanish consent form with them, and they signed the form. Moreover, Evencio cooperated with officers by leading them to Barbosa's apartment in building 305. See United States v. Alcantar, 271 F.3d 731, 738 (8th Cir. 2001) (failing to object to the continuation of a consent search makes the continued search objectively reasonable). We conclude that Evencio and Steven voluntarily consented to the search of the apartment and that the district court did not err in denying the motions to suppress.

13

United States v. Ruiz, 412 F.3d 871, 880 (8th Cir.), cert. denied, 126 S. Ct. 590 (2005).

> Zamoran-Coronel clearly responded to Officer Gonzales' questions affirmatively and directly. He inquired, both in English and Spanish, whether he could search her car. She replied "yes" and signed a form to the same effect. Moreover, her conduct comports with voluntarily given consent. She did not object to the search before, during or after it. Moreover, she cooperated by handing over the keys. That no one informed her that she had a right to refuse merits little concern, as the evidence does not show that the officers engaged in any wrongdoing or constitutionally coercive conduct that would have suggested to a reasonable person that she had no such right.

United States v. Zamoran-Coronel, 231 F.3d 466, 470 (8th Cir. 2000).

> When the officer asked permission to conduct the search, Cortez agreed without hesitation. He even attempted to open the van's rear door, but was stopped by the officer who first wanted to obtain a written consent. The consent form read and signed by defendant was written in English and in his native language, Spanish. A portion of the consent form read: "I understand I have the right to refuse to consent to the search.... I state that no promises, threats, force[,] or physical or mental coercion of any kind whatsoever has been used against me to consent to this search."

United States v. Cortez, 935 F.2d 135, 142 (8th Cir. 1991), cert. denied, 502 U.S. 1062 (1992).

In this case, defendant said the officers could come inside, he never objected to their presence, he consented to a cursory search of the residence for people, he told the officers he had a gun under his pillow and it was "no

14

problem" if they retrieved it and secured it, he verbally consented to a search of the residence for drugs and money, he signed a consent-to-search form written in Spanish, and the police honored his invocation of his right to remain silent. There simply is no evidence of threats or coercion in this record.

Therefore, for the above reasons, I conclude that defendant voluntarily consented to a search of his residence, and his motion to suppress evidence should be denied.

## IV. CONCLUSION

Based on the above-stated findings of fact and the law as discussed in section III, I make the following conclusions of law:

1. Defendant voluntarily consented to the police entering his residence.

2. Defendant voluntarily told police he had a gun in his residence and voluntarily consented to the police retrieving that gun.

3. Defendant voluntarily consented to a search of his residence.

Based on all of the above, it is

15

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order denying defendant's motion to suppress evidence.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of this report and recommendation to file and serve specific objections.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 23, 2006